THE STATE v. JENNINGS, *Appellant.*

1. **Criminal Law**: RECENT POSSESSION OF STOLEN PROPERTY: PRESUMPTIONS. Where property has been stolen, and recently thereafter it is found in the possession of another, such person is presumed to be the thief, and, in the absence of other rebutting evidence, if he fail to account for his possession of such property in a manner consistent with his innocence, this presumption becomes conclusive against him.

   An instruction to this effect is not open to the objection that it assumes as a fact, that defendant was in possession of the property recently after it was stolen.

2. ———: ALIBI: BURDEN OF PROOF. Where an *alibi* is relied upon as a defense in a criminal prosecution, the burden rests upon the defendant to establish it to the satisfaction of the jury.

3. ———: ABSENT WITNESS: CONTINUANCE. Where a continuance is asked by a defendant in a criminal prosecution, on account of the absence of material witnesses who had been subpœnaed, but for whom no attachment had been asked, in a case where an attachment would have been ineffectual to secure their attendance, the prosecuting attorney may prevent a continuance by admitting, as provided by statute, (R. S. 1879, § 1886,) that said witnesses, if present, would testify as stated in the application of the accused for a continuance. Such construction of the statute does not deny to the accused his constitutional right to have process to compel the attendance of witnesses in his behalf. Const. 1875, art. 2, § 22.

SHERWOOD, J., DISSENTING.

1. **Criminal Law**: CONSTITUTION: CONTINUANCE. Revised Statutes 1879, section 1886, violates section 22 of article 2 of the Bill of Rights, because the latter section provides that a defendant in a criminal cause, shall have compulsory process for his witnesses, a right which the statute denies him.

2. ——: ——: ——. It is unconstitutional, because, while the constitution lodges in the breast of the trial court the authority, upon facts presented, to grant or deny a continuance in a criminal cause, the statute in question, whenever operative, transfers that judicial discretion to the prosecuting attorney, by him alone to be exercised.

3. ——: ——: ——. It is, also, unconstitutional, because the rights conferred by the Bill of Rights are excepted out of the general powers of the government. While those rights continue in force, they are to remain absolute and unchangeable rules of action and decision, and all laws contrary thereto are void.

4. ——: ——: ——. For these reasons, it is beyond the power of the legislature to take away from a defendant, charged with crime, a plain constitutional right; the right to compel the attendance of his witnesses, and force upon him in lieu thereof the beggarly substitute of his own affidavit, praying for the enforcement of that very same constitutional right.

HENRY, J., DISSENTING.

**Criminal Law**: RECENT POSSESSION OF STOLEN PROPERTY: PRESUMPTIONS. The recent possession of stolen property affords no presumption, either of law or fact, which the court may declare to the jury, that the person so in possession stole it, but is only circumstantial evidence of guilt. And it does not devolve upon the accused to show that his possession is not guilty possession, but the burden is upon the State throughout. HOUGH, C. J., concurring.

*Appeal from Henry Circuit Court.*—HON. J. B. GANTT,

Judge.

AFFIRMED.

*M. A. Fyke, B. G. Boone* and *P. A. Parks* for appellant.

The court erred in overruling defendant's application for a continuance. The witness, Peerey, had been duly

subpœnaed, but was injured and taken sick but a few days before the trial, and could not attend, and the application being made at the term at which the indictment was found, the court ought to have given the defendant the benefit of the personal presence of the witness before the jury. An attachment in this case would have been of no avail, as the witness was sick and unable to attend court, as the court found by holding that the application was sufficient. *State v. Hickman,* 75 Mo. 416. The instruction upon the recent possession of stolen property, was erroneous. 1st, Because it assumes that defendant recently after the mare was stolen had possession of her—a fact which defendant denied all the way through the case. 2nd, It tells the jury that defendant relies in part for his defense on the claim that he was not present when the mare was stolen. It wholly ignores all evidence as to the fact that defendant was not at Warrensburg, and, therefore, not in the possession of the mare.

*D. H. McIntyre,* Attorney General, for the State.

The court did not err in overruling defendant's application for continuance. The absent witnesses were unable to attend on account of sickness. No attachment was asked in either case, and if it had been, the witnesses were, by defendant's own showing, too sick to attend, and it would not have been error to refuse it. *State v. Hatfield,* 72 Mo. 518. It is in just such cases that the admissions provided for by section 1886 may be made. *State v. Hickman,* 75 Mo. 416. The instruction as to recent possession of stolen property, correctly declares the law, (*State v. Bruin,* 34 Mo. 541); and a preponderance of evidence was necessary to establish an *alibi. State v. Northrup,* 48 Ia. 583; *State v. Kline,* 54 Ia. 183; *State v. Krewsen,* 57 Ia. 588; *State v. Red,* 53 Ia. 69; *State v. Reitz,* 83 N. C. 634; *Wade v. State,* 65 Ga. 756.

NORTON, J.—The defendant was indicted in the circuit

court of Henry county at its December term, 1882, and at the
same term, on the 12th of January, 1883, defendant applied
for a continuance because of the absence of two material
witnesses, both of whom had been subpœnaed; but in con-
sequence of sickness were unable to attend the trial.   Upon
the admission of the prosecuting attorney that the wit-
nesses, if present, would testify as stated in the affidavit,
and that such statement might be read as their evidence,
the court overruled the application and the trial proceeded,
which resulted in the conviction of defendant.   The cause
is before us on defendant's appeal, and the action of the
court in overruling the application for the continuance and
in giving the following instruction are assigned for error :

"The court instructs the jury that the law presumes
the innocence and not the guilt of the defendant, and allows
this presumption to continue until overcome by evi-
dence proving his guilt.   And on the other hand where
property has been stolen, and recently thereafter, the same
property is found in possession of another, such person is
presumed to be the thief, and, if he fails to account for his
possession of such property in a manner consistent with his
innocence, this presumption becomes conclusive against
him; but in this case, the jury are instructed, that the de-
fendant relies, in part, for his defence upon the claim that
he was not present when the mare was stolen, as charged
in the indictment, but was some distance from the place
where said mare was taken at the time of said taking.
Now if the jury find and believe from the evidence, that
at the time said mare was stolen, the defendant was not
present at the place from which she was stolen, but was
some distance from said place, then the jury must acquit
him, as the presumption of guilt from such recent posses-
sion would be rebutted by such proof made to the satisfac-
tion of the jury."

The rule announced in that portion of the instruction
which relates to the presumption arising from the recent
possession of stolen property has received the repeated

sanction of this court. *State v. Kelley*, 73 Mo. 608, and the cases therein cited; *State v. Babb*, 76 Mo. 501.

The remaining portion of the instruction, which counsel for defendant claims to be misleading, and subject to be construed as assuming that defendant was in the possession of the mare, the subject of the larceny, recently after she was stolen, when considered with reference to the other instructions given and the evidence, could not have prejudiced defendant nor misled the jury.

On the trial the State sought to establish the guilt of defendant by showing that he was seen in Warrensburg about 8 o'clock in the morning, of the day after the theft was committed with the stolen mare in his possession, and that he sold her there for $65, she being worth about $150. The evidence introduced by the State tended to establish the above facts. On the other hand, the evidence introduced by the defendant, tended to show that at the very same time the State's witnesses said defendant was in Warrensburg, he was at another place, twenty odd miles distant from Warrensburg. In this conflicting state of the evidence, it was for the jury to determine the question, as to whether or not, defendant was seen in possession of the mare the morning after she was stolen, and this question, as well as all others, were fairly submitted to the jury in other instructions, in which they were told that they were the sole and exclusive judges of the credibility of the witnesses and the weight to be given their evidence; and, if from all the evidence in the case, they entertained a reasonable doubt of defendant's guilt it was their duty to acquit him. We do not understand the instruction to assume as a fact, that defendant was in possession of the stolen property recently after it was stolen; but as a direction to the jury that although they might believe that defendant was seen in the possession of the animal soon after she was stolen, yet if they further believed that defendant was not present at the place from which she was stolen, but was some distance therefrom, that this would rebut the presumption

arising from such possession, that he was the thief. The requirement that the *alibi* relied on should be made out to the satisfaction of the jury was fair to defendant; the burden of establishing it rested upon him and he cannot complain of the instruction in that respect, especially so in view of the instruction given that if on the whole case the jury had a reasonable doubt they would acquit, and the further instruction that before they could convict on circumstantial evidence, the circumstances tending to show guilt should be established beyond a reasonable doubt, and when the circumstances so established should point so strongly to the guilt of defendant as to exclude any other reasonable hypothesis.

It is also insisted that the court erred in overruling defendant's application for a continuance. It appears that the application was based on the absence of two witnesses who had been subpœnaed, but were not in attendance, and that an attachment, which, so far as the record shows, was not asked, would have been ineffectual to secure their attendance had it been asked. Upon the admission of the prosecuting attorney, that said witness, if present, would testify to the facts stated in the affidavits, and that such statement should be read as their evidence, the continuance was refused, and the trial proceeded with. This action of the court is fully sustained by the cases of *State v. Hickman*, 75 Mo. 416; *State v. Underwood*, 75 Mo. 230; *State v. Miller*, 67 Mo. 604; *State v. Hatfield*, 72 Mo. 518; *State v. Underwood*, 76 Mo. 630.

It is claimed that the act of the legislature authorizing such action as was taken by the court in this case in regard to the continuance, is in violation of the constitutional right given to a defendant in a criminal prosecution to have compulsory process to procure the attendance of witnesses in his behalf. In the case of *State v. Hickman, supra*, this precise question was before the court, and it was held that when a defendant had availed himself of the process of the court to procure his witnesses, and it had failed to

secure their attendance, that the act authorizing or requir-
ing the court to overrule an application for continuance,
based upon the absence of such witnesses, provided the
prosecuting attorney would agree that the statement of
what they would swear to, if present, should be read as
their evidence, violated no constitutional right of defend-
ant.   At one time in the history of the common law a de-
fendant in a criminal case could not avail himself of the
process of the court to bring in his witnesses, and if he suc-
ceeded in getting them before the court without such pro-
cess, while he might examine them he could not demand
that they should be sworn.   To remedy this wrong and
change the rule, a clause, in effect the same as that con-
tained in our bill of rights, is to be found in Magna Charta.
The evident purpose of it was to give to persons criminally
charged the means of getting evidence in their behalf be-
fore the court and jury, through the process of the court.
Its object was to prevent a person charged, with being
tried for a crime without the evidence he wished to offer in
his defense.   When the process to procure the attendance
of witnesses has been resorted to by a defendant, and proves
to be ineffectual, the act of the legislature, which provides
that notwithstanding such failure, if he state in his applica-
tion for a continuance what he expects to prove by the
absent witness, whom the process of the court has failed to
bring, and the prosecuting attorney admits that such state-
ment may be received and read as the evidence of such wit-
ness (which, when read, we have held shall be entitled to
the same weight as the evidence of any other witness) the
continuance shall not be granted, may be said to be in aid,
rather than in contravention of defendant's constitutional
right to process, inasmuch as he gets the full benefit of the
evidence without having his witness subjected to a cross-
examination by the State.

   " The power of cross-examination has been justly said
to be be one of the principal, as it certainly is one of the
most efficacious, tests which the law has devised for the

discovery of truth.    *     *    It is not easy for a witness who is subjected to this test to impose on a court or jury, for however artful the fabrication of falsehood may be it cannot embrace all the circumstances to which a cross-examination may be extended." Greenleaf's Evidence, § 445.

The act in question gave to the defendant the benefit of the evidence of his witnesses, without the severe test of a cross-examination being applied to discover the truths of such statements. The above principle doubtless gave rise to the constitutional requirement, that the accused should have the right to meet the witnesses against him face to face, in order that the truth of their statements might be subjected to the test which a rigid coss-examination always affords. The argument which would strike down the act in question as being in contravention of the constitution, would also strike down that rule of law which makes the dying declarations of the victim of a murderer evidence against the person charged with the crime. And this court has held, all the judges concurring, that such testimony is admissible, and the rule authorizing its acceptance is not in violation of the constitution, which expressly declares, that the accused shall have the right to meet face to face the witnesses against him. *State v. Vanzant*, 80 Mo. 67.

Revised Statutes, section 1886, which is claimed to be in contravention of defendant's constitutional right to process, does not deny to a person criminally charged the right to resort to the process of the court to bring in his witnesses; but provides, as construed by this court in the case of *State v. Hickman, supra*, that the trial shall proceed when the process, when resorted to, has been ineffectual to secure the presence of the witness, upon the admission of the prosecuting attorney that the statement contained in the affidavit for continuance as to what the absent witnesses would swear to should be received as their evidence. It was held in that case, that the above section " can only be in-voked by the state after the accused, by exercising reason-

able diligence, shall have unsuccessfully employed the power of the court to secure the personal presence of such of his witnesses as may be within the reach of its process. He is entitled to a reasonable time to have a subpœna, which has been seasonably issued, served and returned; and if the witness be found and fail to attend, he is entitled to an attachment to compel his attendance. If the attachment prove unavailing, and the defendant thereupon applies for a continuance, the State may then prevent a further delay in the trial by consenting that the facts which the absent witness is expected to prove, and which are set out in said application, shall be taken and received by the court and jury as the testimony of such absent witness."

Judges Hough, Henry and Ray concur in the views expressed herein in reference to the action of the court in overruling the application for continuance, and Judges Ray and Sherwood concur in the views expressed in reference to the action of the court in giving the instruction complained of. This results in an affirmance of the judgment, and it is hereby affirmed.

SHERWOOD, J., DISSENTING.—On one of the points decided in the foregoing opinion, I do not concur, and, therefore, I will now discuss the correctness of the ruling which compelled the defendant to go to trial, notwithstanding his affidavit and application for a continuance. This discussion will, of course, involve the constitutionality of section 1886, which is as follows:

"Section 1886. Testimony of absent witness may be admitted—effect of. If in any such case the adverse party will consent that on the trial the facts set out in the application or affidavit, as the facts which the party asking the continuance expects to prove by the absent witness, shall be taken as and for the testimony of such witness, the trial shall not be postponed for that cause; but the facts thus set out shall be read on the trial and shall be taken and received by the court or jury trying the cause, as the testi-

mony of the absent witness; but such facts may be contradicted by other evidence, and the general reputation of such witness may be impeached as in the case of other witnesses who testify orally or by deposition."

This section has been passed upon heretofore, but its constitutionality was not even alluded to in the case of *State v. Miller*, 67 Mo. 604; nor in that of *State v. Hatfield*, 72 Mo. 518; though it seems to have been taken for granted. But the constitutionality of this section was evidently questioned in the case of *State v. Underwood*, 75 Mo. 230, and the former cases were very doubtingly and with extreme reluctance followed. The judgment in that case, however, was reversed solely because the trial court, in its instructions, took an unwarrantable distinction between the testimony of witnesses personally present, and the statutory testimony of those who were absent. The latest adjudication on the subject is the *State v. Hickman*, 75 Mo. 416. In that case, though section 22 of article 2 of the constitution is quoted, the constitutionality of section 1886 is not discussed.

It is impossible to overestimate the importance of the point thus presented, since, upon its proper determination, may depend the life or liberty of every citizen against whom is brought a criminal accusation. In discussing a topic of such importance, all questions of expediency, all questions of cost, all questions of convenience, all questions of a rapid disposition of causes on the criminal calendar, are not entitled to a moment's serious consideration. When compared with and weighed against a great fundamental right, such minor questions as above noted resemble indeed the "small dust of the balance."

The only point to be looked to, therefore, is, what does section 22 of article 2 of that portion of our constitution, commonly called the Bill of Rights, mean when it says that "in criminal prosecutions the accused shall have process * * to compel the attendance of witnesses in his behalf?" Mr. Justice Story has said in reference to the

proper method to be pursued in construing constitutions:
" They are instruments of a practical nature, founded
on the common business of life, adapted to common wants,
designed for common use, and fitted for common under-
standing.	The people make them, the people adopt them;
the people must be supposed to read them with the help of
common sense, and cannot be presumed to admit in them
any recondite meaning or any extraordinary gloss." Story
Const., § 451. In short, that the words of such an instru-
ment are to be taken and received in their ordinary accep-
tation and import, and no hidden, abstruse, specious, plaus-
ible, out-of-the-way meaning is admissible. And that
learned author and eminent jurist elsewhere says that "the
first and fundamental rule in the interpretation of all in-
struments, is to construe them according to the sense of the
terms and the intention of the parties," and that " words
are generally to be understood in their usual and most
known signification, not so much regarding the propriety
of grammar as their general and popular use." Ib., § 400.

It would only be the assertion of an acknowledged
fact to say of the words under discussion, that " in their
usual and most known signification," that in " their general
and popular use " they mean, and have always been con-
strued to mean, the right of the accused, in his own behalf,
to compel the *personal presence* of his witnesses at the time
when and the place where the " criminal prosecution " is in
progress. For what purpose are those witnesses thus com-
pelled personally to attend at the time and place of such
" criminal prosecution ?"	Only one answer can be given to
this question, an answer derived from contemporary con-
struction and habitual practice, ever since the constitutional
provisions were adopted, and that is, that those witnesses
may testify *orally* and in *open court* touching the innocence
or guilt of the accused.

The framers of our American constitutions were well
acquainted with the history of criminal trials in the mother
country. They were many of them profound and learned·

lawyers, and they knew by heart that dark and bloody history. They knew that in criminal trials in England the accused was not allowed, in capital cases, and all felonies were capital, to have compulsory process for his witnesses; to have them, when present, even so much as sworn; they knew that Lord Coke had vainly denounced such practices as contrary to *magna charta*, tyrannical and unjust, and had declared that a trial "according to the law of the land" meant and included the right of the accused to have witnesses sworn for him. They knew that the English judges absolutely refused to permit a party accused in criminal cases to exculpate himself by the testimony of any witness. They knew that even those judges, the subservient tools of the British crown, had at last grown so heartily ashamed of such a practice, that they gradually introduced the practice of examining witnesses for the accused, but not upon oath. The consequence of which was, that the jury gave less credit to this latter evidence than to that produced by the government. They knew of those gloomy transgressions of natural and positive law that rendered the English courts, "in cases of treason, little better than caverns of murderers." They knew that such trials proceeded with "the want of all evidence except written, perhaps unattested examinations or confessions." Hallam Const. Hist., 138. They knew that the criminal jurisprudence of England was "crimsoned with the blood of persons who were condemned to death, not only against law, but against the clearest rules of evidence." 2 Story Const., § 1792. Knowing all this, the framers of our State constitution were not content to say, as they do in section 30 of article 2 of our Bill of Rights: "That no person shall be deprived of life, liberty or property, without due process of law," but they went further and ordained section 22, already referred to, declaring thereby in the most positive and emphatic terms:

" *In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel; to demand the*

*nature and cause of the accusation; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county."*

Of a similar provision in the amendment to the constitution of the United States (article 6, amendments,) Mr. Justice Story remarks: "The wisdom of these provisions is, therefore, manifest, since they make matters of constitutional right what the common law had left in a most imperfect and questionable state. The rights to have witnesses sworn and counsel employed for the prisoner, are scarcely less important privileges than the right of a trial by jury. The omission of them in the constitution is a matter of surprise, and their present incorporation is a matter of congratulation among all the friends of rational liberty." 2 Story Const., § 1794.

Mr. Justice Cooley, when treating of the force and effect of that portion of a written constitution, termed a Bill of Rights, says: "Other clauses are sometimes added declaratory of the principles of morality and virtue; and it is also sometimes expressly declared, what indeed is implied without the declaration, that everything in the declaration of rights contained is excepted out of the general powers of government, and all laws contrary thereto shall be void. * * While they continue in force they are to remain absolute and unchangeable rules of action and decision." Cooley Const. Lim., 46.

In the light, then, of the obvious meaning of the words employed in the section of the constitution under discussion, in the light of their usual signification, in the light of the contemporaneous construction of those words, in the light of the habitual practice in the courts, in the light of the authorities I have quoted, not a doubt lingers in my mind that section 1886 of the statute, is in conflict with section 22, article 2, of the Bill of Rights; that those rights are "excepted out of the general powers of the government;" that they constitute absolute and unchangeable

rules of action and decision, and section 1886 being contrary thereto, is of consequence void, for no one can doubt, but for this statute, the right of a party accused, whose affidavit discloses due diligence, to have the full benefit of the constitutional provisions ordained in his behalf. *State v. Farrow,* 74 Mo. 531. But under the operation of the statute an accused party who makes the proper showing for a continuance, is deprived of, and cut off from, his constitutional right, at the option of the prosecuting attorney, by the latter merely consenting that the allegations of the affidavit for a continuance shall be taken as and for the testimony of the absent witness. If the prosecuting attorney were required by the statutes to directly admit the truth of the allegations of the affidavit, there would be more plausibility in the view that the requirements of the constitution were fulfilled, and some of the authorities hold that such direct admission will answer. *People v. Vermilyea,* 7 Conn. 369; *Van Meter v. People,* 60 Ill. 168; *People v. Diaz,* 6 Cal. 248; *Dowings v. State,* 7 S. & M. 475; *State v. Butte,* 6 La. Ann. 652; *Wassels v. State,* 26 Ind. 30.

There were no statutory provisions, however, in the state where those cases were decided, but if it be true, as the autorities hold, that over the rights secured by the Bill of Rights no department of the government, neither executive, legislative nor judicial, has any control, and all laws contrary thereto are void, the case at bar must be regarded in the same light as if the statute under discussion had not been enacted; and if this be true, then those cases are not without bearing upon the present investigation, holding, as they do, that an admission of the allegations of the affidavit by the prosecuting attorney, such as that provided by section 1886, and which that official was allowed to contradict, was altogether insufficient.

In *Vermilyea's case, supra,* Wadsworth, J., in speaking on this point, said: "The defendants were entitled to the oral evidence, or what was equivalent, or they were entitled to nothing. Is it, then, an answer to say 'Gen. Swift would

so swear?' Is such a mode of receiving a witness' testimony known to the law? Should time be taken at this day to show the difference between such evidence and the oral testimony of a witness, to demonstrate the vital importance of an open and public examination before a jury? Where the witness speaks not only in direct language, but by his appearance, his explanations, his corrections of what may be doubtful, inconsistent or apparently untrue? Such was the testimony to which the defendants were entitled, if to any; not evidence reflected through their affidavits; subject, besides, to have its already diminished and feeble force destroyed by adverse testimony. A witness is called. He is impeached in certain particulars. Is he not uniformly called again to correct and explain? Is it not familiar with the whole profession that such a course is material and many times essential to the ends of justice? We all know the superior weight of a witness attending in person ; how important it is, especially in a complicated matter, that he should be on the spot to obviate seeming contradictions. There seems to me no doubt that this admission was very far from giving the defendants an equivalent for Gen. Swift's personal testimony. Witnesses were introduced, the tendency of whose evidence was to show that he knew nothing; that he was entirely unacquainted with the transactions in controversy. Various explanations might have been given to that evidence by Gen. Swift. I know of no rule, which, in a case like this, stops short of an absolute concession of the facts stated in the affidavits of the party."

And in that case that of *Hooker v. Rogers*, 6 Cowan, 577, is spoken of approvingly, where the judgment was reversed because the witness, being unable to attend, this was held sufficient cause for putting off the trial, on the ground that "substituting the examination of witnesses on interrogatories for their personal attendance might prejudice the defendant's rights. He was entitled to their personal attendance." Now, if this be the rule in civil cases, then, *a fortiori*, it should be the rule in criminal cases. In

Van Meter's case, the supreme court of Illinois held that the only admission which ought to be received from the prosecuting attorney was one "admitting the statements of the affidavit to be absolutely true." And when speaking of permitting the affidavit to be contradicted by the prosecuting attorney, remarked: "This would take from the accused what might be of the greatest importance if his affidavit may be contradicted—the right to have his witnesses seen and heard by the jury."

For these reasons, already stated, and others presently given, I am of the opinion that the better view of this subject is that taken by the supreme court of Tennessee, where it is held that even an unqualified admission of the truth of the facts set forth in the affidavit, will not answer the demand of the constitution. Ruse, J., remarking: "In the case referred to in 10 Yerg. we say that the practical operation of such an arrangement upon the rights and fate of the defendant must often, if not always, be perfectly illusory. We now go further than the intimation contained in that case, and say that where the admission of the counsel for the State is not merely that the witness would testify as stated, but that the facts are true as set forth in the affidavit, such admission should not preclude the defendant, in a criminal case, from his constitutional right of having the witnesses personally present at the trial. It were needless to urge upon practical and intelligent minds the difference in point of legitimate effect between the personal presence of candid, respectable witnesses, who testify to facts in detail, ramification and bearing, and the general admission of these by an attorney-general, little impressing perhaps the minds of the jury, and constituting as to its extent and bearing a fruitful source of difficulty and dispute. It were needless to urge how such a practice would tempt the unfortunate defendant, if he must forego the advantage of personal attendance of his witnesses, to seek an undue equivalent by amplifying at the hazard of perjury, the statement in his affidavit so as to obtain the broadest possible admis-

sion from the State. In every view, therefore, as it regards the rights of the defendant, and the safe, equal and pure administration of justice, the practice referred to is improper and erroneous." *Goodman v. State*, Meigs, 195. This ruling was followed in the cases of *De Warren v. State*, 29 Tex. 464; *People v. Dodge*, 28 Cal. 445.

But I am told that the sole object of the section 22, aforesaid, "*is to enable the defendant to get the testimony of his witnesses.*" If such was the purpose of the section, the framers of the constitution were singularly unhappy in the employment of words whereby to convey their meaning. If those framers of the constitution had intended any such thing they would unquestionably have left out the meaningless words, "attendance of witnesses," and substituted therefor, "the testimony of witnesses in his behalf," thus keeping alive and fostering the very evil which the whole history of the subject shows they intended to pluck up and destroy root and branch.

If, as Judge Cooley says, the rights secured by the Bill of Rights are "absolute and unchangeable rules of action and decision;" if "they are excepted out of the general powers of the government;" if "all laws contrary thereto should be void," by what authority is it, the legislature can say that any assumed equivalent can be given the defendant in lieu of these rights, which the constitution, in such plain and unmistakable terms bestows?

By what authority is it that the legislature makes this forced exchange with the accused? By what authority do they wrest from him his clear, simple, and plain constitutional right, and give him in lieu thereof such a beggarly substitute? By what authority do they give him a *paper* for a *man*.

If the legislature may thus emasculate one provision of the Bill of Rights, why not another? Why may they not, with equal propriety and consistency, go further, and deny the accused, when on trial, the personal presence of his counsel, and provide in lieu thereof, that "it shall not be

necessary in criminal prosecutions that the counsel for the accused shall be personally present, but that it shall be sufficient in all such cases that the counsel for the accused shall deliver to the jury a written brief of points on which he relies, and that such brief shall be taken and received by the court or jury trying the cause as the brief of the absent counsel?" Surely, if the legislature may do the one thing, they may also do the other. If they may, then, in the expressive language of Judge Norton, in the Lafayette county case, "constitutional provisions accomplish nothing, and organic laws may be set at naught by the merest evasion." When treating of the binding and obligatory force of constitutional provisions a very learned and accomplished jurist of New York, Judge Bronson, has expressed himself in this elevated and noble language: "It is highly probable that inconveniences will result from following the constitution as it is written, but that consideration can have no weight with me. It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office upon themselves, or if, under color of construction, or upon any other specious ground they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be worse than useless."

"Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions, which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be attained, by pushing the powers of government beyond their legitimate boundary. It is by yielding to such influences, that constitutions are gradually undermined and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people

can amend it, and inconveniences can be borne long enough to await that process.  But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the institution which nothing can heal.  One step taken by the legislature or judiciary in enlarging the powers of the government, opens the doors for another, which will be sure to follow, and so the process goes on until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them." *Oakley v. Aspinwall*, 3 Coms. 547.  And Chief Justice Marshall, when treating of unconstitutional provisions, remarks :

" To say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them, nor contemplated by its framers, is to repeat what has been already said, more at large, and is all that can be necessary." *Ogden v. Sanders*, 12 Wheat. 213.

And Chief Justice Black has said:

" I am thoroughly convinced, that the words of the constitution furnish the only test to determine the validity of a statute, and that all arguments based on general principles outside of the constitution, must be addressed to the people and not to us." [*Sharpless v. Mayor*, 21 Penn. St.]

All lawyers experienced in criminal trials, feel and know the supreme importance of oral testimony, of the personal attendance of witnesses.  They know full well the difference between a written statement and oral testimony, between a paper though admitted to be true, and the personal presence and demeanor of a witness, who looks the jury in the eye when telling his story of the transaction. They know that very often the statement of a witness when made in chief, appears highly improbable, but that

the witness upon cross-examination by the state will, by a clear detail of the facts and surrounding circumstances, so support and fortify his examination in chief as to convince every hearer of the entire truth of his testimony. Besides that, they know that very frequently the witness, when testifying, will disclose what the accused did not and could not know, that others were present who will corroborate and confirm his story in every essential particular. But all these advantages—advantages which the constitution in express terms bestows—will be swept away from the accused if denied compulsory process for his witnesses. I, therefore, do not feel at liberty to hold section 1886 constitutional, at least so far as concerns witnesses who are within the jurisdiction of the court, or of whose return, though temporarily absent from such jurisdiction, there is a reasonable and well-grounded prospect. *Rex v. D'Esu*, 3 Burr, 1513.

In Kansas, a state possessing constitutional and statutory provisions substantially similar to those under discussion, the supreme court there says: "The defendant has a constitutional prerogative to have compulsory process to compel the attendance of witnesses in his behalf. [Sec. 10, Bill of Rights.] This privilege is stripped of all its benefits to a defendant in a criminal case, if such defendant is forced to trial, and his trial is concluded before the return of the compulsory process issued to bring into court witnesses in his behalf who have disobeyed subpœnas duly served upon them. Of course, no court has the right to limit or deny this constitutional guarantee against the protest of an accused." Whether the statute now being discussed as to witnesses who are confessedly non-residents would be obnoxious to constitutional objections, it would be premature now to discuss. It has been held, however, by this court, that compulsory process cannot, under the constitution, be demanded for witnesses who reside beyond our state boundaries. [*State v. Butler*, 67 Mo. 59.]

In the case at bar, the affidavit shows grounds amply

sufficient for a continuance, the witness having been duly subpœnaed, and in consequence of sickness, being unable to attend.

I will not be understood as meaning that section 22 of article 2, is to receive any unreasonable construction. I will not be understood as abating the exercise of that reasonable judicial discretion, which the law confers on the trial courts. But I do mean that when the affidavit for a continuance discloses all the diligence of which the circumstances of the case admit; that when that affidavit discloses fair and reasonable grounds for the belief that a material witness is within the compulsory process of the court, or only temporarily absent from the territory of its jurisdiction, and that his attendance can be secured by the next term, that then the constitutional right of the accused asserts itself, compelling a continuance, and imperatively forbidding any legislative makeshift from being foisted upon him. If it be asked how often is a continuance to be granted to a defendant, I reply, each case must be governed by its own circumstances, and if it be in doubt whether the trial court exercised its discretion soundly or unsoundly, the presumption will be in favor of its action. *State v. Farrow,* *supra*

But I certainly would not undertake to say in advance, that a case might not present such features of diligence, such features of the material nature of the desired testimony, such features of inevitable accident and unavoidable delay, as would, if a second affidavit for a continuance were denied, shock any man's sense of native justice, and compel the declaration, that the judicial discretion had been unsoundly exercised.

Under the ruling in *Hickman's case, supra,* the issuance and service of a *single* subpœna, and the issuance and attempt to serve a *single* attachment, although the witness resides within the jurisdiction of the court, and within a stone's throw of the court-house, *exhausts the constitutional right of the accused,* and leaves him to the tender mercies of

the statute and of the prosecuting attorney, and converts the reasons given in the affidavit for a continuance, into reasons for its refusal, at the option of that officer.

Under that ruling the application for a continuance is in reality addressed, not to the discretion of the court, but to that of the prosecuting attorney, and in his hands are the issues of life and death

The constitution confides that discretion to the breast of the court, as its sacred and only repository, and the fact that the statute, in order to become operative, removes that discretion and arbitrarily lodges it in the breast of the prosecuting officer, is sufficient of itself to brand the section in question with the stigma of unconstitutionality. I cannot persuade myself that the constitutional rights of a defendant, in a criminal case, are held by so slight a tenure, or that they can so easily be abrogated.

In marked contrast with the ruling in that case is a decision of that eminent jurist, Lord Mansfield, where no constitutional question was indeed involved, but only such rights as appeal to the best emotions of our common humanity.

A poor woman was indicted in England for having received a pension as an officer's widow, the indictment charging she was never married to him. Brought to the bar of the court to answer to the charge, it became known that her witnesses resided in Scotland. No process could issue from England to that country, nor was there any means known to the law for obtaining their testimony. Upon the facts becoming known, the court told the prosecutor that, unless he would consent on record that the depositions of the witnesses should be taken in Scotland and read in evidence on the trial, they would *"continue the case forever."* Cited in *Mostyn v. Fabrigas,* 1 Cowp. 161.

I have spoken of cases of inevitable accident, unavoidable delay, etc. I will instance one such case, and then I have done:

> " For the argument, both apt and ample,
> Is, for instance, the example."

In one of the counties on our western border, on a certain night, a most atrocious murder is committed. The evidence is wholly circumstantial, but points with sufficient directness toward a certain man as the perpetrator of the crime. He is arrested. Popular excitement is great. Circuit court being in session, he is forthwith indicted for the murder. Fortunately he is able to prove by a physician, as eminent for his integrity as for his professional ability, and known and esteemed by the people of the whole county, that on the fatal night he, the defendant, was twenty miles distant from the scene of the crime. A subpœna is issued for this witness, and he is duly served, and a return thereof duly made. The prisoner is duly arraigned and pleads not guilty to the charge. After this, asked if he is ready for trial, upon his request the witness is called and fails to answer. Being pressed for an announcement, he causes an attachment for the witness to be sued out, and it proves unavailing. Then a letter is received from the witness stating that he had been suddenly called across the state border to attend, in his professional capacity, one dangerously ill, but that he would probably return in about a week's time and testify in the cause. Thereupon the defendant files an affidavit for a continuance, setting forth all the usual matters ; that the witness is the only one by whom defendant can prove his *alibi* and his innocence, and affixing the letter to the affidavit, asks that a continuance be granted him to a time named, stating his belief, and his reasons for his belief that if a continuance be granted, as prayed, that he will be able to have his witness in attendance, etc. Whereupon the prosecuting attorney, on conviction bent, knowing that he has the defendant on the hip, and relying on the ruling in *Hickman's case*, decides to " prevent a further delay in the trial by consenting that the facts which the absent witness is expected to prove, and which are set out in said application, shall be taken and received by the court or jury trying the cause, as the testimony of such absent witness." This being done, the defendant vainly begging

for brief delay; vainly insisting on his blood-bought con-
stitutional right "as a lamb to the slaughter, and as a sheep
before her shearers," is forced into trial, and popular indig-
nation running high, and having only paper testimony, is,
as might be expected, convicted of murder in the first de-
gree.

With all deference to my associates, I can only say that
such a conviction, amid such surroundings, though *secun-
dum legem*, as goes *Hickman's case*, is worthy alone of
"*twelve butchers for a jury and Jeffries for a judge !*"   And
I here confidently venture the prediction that when a real
case like the hypothetical one shall come to this court, my
associates will say aye to this declaration.

HENRY, J., DISSENTING.—The fact that one is found in
the possession of goods, recently after they are stolen, is a
circumstance tending to prove that he stole them; and the
force of the circumstance is strong or weak, according to
the character of the property, and the period of time which
has elapsed between the commission of the crime and the
possession proved.    If the property be of a kind which
readily and rapidly passes from hand to hand, as a piece of
coin or a bank bill, and many days have elapsed since the
theft was committed, the possession of the stolen coin or
bank bill could be, of itself, no evidence of guilt.    If one
be seen standing over the dead body of another with a
weapon in his hand, such as the man was slain with, it
would be the strongest evidence that he slew him, but no
court or author ever held that the law, from that circum-
stance, presumed him to be the murderer, or that he com-
mitted the homicide.    Why should there be a presumption
of guilt from the recent possession of stolen property, and
not in the case supposed, from a circumstance tending more
strongly to prove guilt?    In either case the evidence would
warrant a conviction, but to presume, in the latter case,
that the man found standing over the dead body was the
murderer, would be to presume from a circumstance only

tending to prove that he had committed a homicide, all the constituent elements of murder. To that extent no court or law writer has gone, and there is not the slightest distinction in principle, between that and the case of recent possession of stolen property. In the case of the *State v. Kelley,* 73 Mo. 608, an instruction similar to the one under consideration, was sanctioned by a majority of this court, and in the opinion delivered it was remarked that: "If you banish one disputable presumption, you, of necessity, banish all of whatever nature and however numerous, by the same edict." Whether there are disputable presumptions of law is not the question. What I assert is, that there is no presumption of law based upon the recent possession of stolen property. But how does it follow if one disputable presumption of law be banished, all are? The legislature might declare that no presumption of guilt should arise from the recent possession of stolen property, and would such an act affect any other presumption of law? Surely a judicial decision declaring that no such presumption arises in such a case, would not reach farther than an act of the general assembly. The presumption declared by the instruction given in the case at bar, mars the harmony of the criminal law—is an anomaly in criminal jurisprudence, has no foundation in reason or philosophy, and has no footing except in loose declarations of text-writers and courts, based upon a practice in England that *has never obtained here,* which permits the court orally to charge the jury on the evidence instead of confining it to written instructions, declaring the law to the jury. *State v. Hodge,* 50 N. H. 510.

In his work on Evidence, Prof. Greenleaf, section 34, volume 1, says: "But possession of the fruits of crime recently after its commission, is *prima facie* evidence of guilty possession; and if unexplained, either by direct evidence, or by the attending circumstances, or by the character and habits of life of the possessor, or otherwise, it is taken as conclusive." In that paragraph the true

14—81

principle is approximated, but in his 3rd volume, section 3, he says: "We have heretofore adverted to the possession of the instruments or fruits of crime as affording ground to presume the guilt of the possessor; but on this subject no certain rule can be laid down of universal application; the *presumption* being not *conclusive* but *disputable,* and, therefore, to be dealt with by the jury alone as a mere inference of fact." Here is a confusion of ideas, remarkable in an author usually perspicuous and accurate. If it is a presumption "to be dealt with by the jury alone, as a mere inference of fact," with what propriety can it be said to be a presumption at all? From the fact of recent possession of the stolen goods, the jury may infer that the party in possession stole them; but if it is a presumption of law, why is it "to be dealt with by the jury alone as a mere inference of fact?" In what other case is the court forbidden to declare a presumption of law which the law raises from a given state of facts? Wherever there is a presumption of law, it is not only the right but the duty of the court to declare it. Recent possession of stolen goods supports neither a presumption of law nor a presumption of fact. If a legal presumption of one fact is based upon another ascertained fact, what is it but a presumption of law? The mass of error which has found lodgment in judicial opinions and elementary works on this subject, has originated in a loose, inaccurate employment of legal terms, and if this or any other court has fallen into error on any question of criminal law, no matter how often repeated, the principle of *stare decisis* does not, and should not, stand in the way of a return to correct principles. The jury in this State tries issues of fact. The court has no right to interfere with them in the discharge of that duty, except to declare the law applicable to the facts, which the jury may find. It is not the province of the court to tell them what fact or facts the evidence proves. That is within their domain, and if the fact of recent possession of stolen property is one "to be dealt with by the jury alone as a mere inference of fact,"

as stated by Prof. Greanleaf, where does the court get its authority to declare as a presumption of law, that one found in possession of stolen property, recently after the theft, is the thief? Whether he means to state that it is a presumption of law or not, what he does say in that connection, is an authority against the instruction given in the case. If "to be dealt with by the jury alone as a mere inference of fact," it cannot at the same time be dealt with by the court as a presumption of law. It is one or the other, and not both. It is not both a mere circumstance tending strongly to prove guilt, and also, affording a legal presumption of guilt.

Mr. Starkie classes the presumption in question under the head of presumptions of mere fact and says: "The recent possession of stolen goods, on a trial for larceny, is recognized by the law as affording a presumption of guilt, and therefore, in one sense, is a presumption of law, but it is still in effect, a mere natural presumption; for although the circumstance may weigh greatly with a jury, it is to operate solely by its own natural force, for a jury are not to convict on this, or any charge, unless they be actually convinced in their consciences of the truth of the fact. Such a presumption is, therefore, essentially different from the legal presumption of fact, lately adverted to, where the jury were bound to infer, that a bond had or had not been satisfied, as a few days or even hours more or less had elapsed." Again, "although it be the peculiar province of the jury to deal with presumption of this description, and to make such inferences as their experience warrants, yet, in some instances, where particular facts are inseparably connected, according to the usual course and order of nature, and the interposition of the jury would be nugatory, the courts themselves will draw the inference." Starkie on Ev. (9 Ed.) 67. Between the fact of recent possession of stolen property and the original taking, there is no inseparable connection "according to the usual course and order of nature," and, on the authority of Starkie, it is not for the court to

declare such a connection, but it is for the jury to determine whether, in the given case, the recent possession of stolen property proves the guilt of the possessor. "A presumption of fact is properly an inference of that fact, from other facts that are known; it is an act of reasoning." Phillips on Ev. 1 Vol., § 599. "The slightest presumption is, of the nature of probability, and there are almost infinite shades, from the slightest probability to the highest moral certainty. If the circumstantial evidence be such as to afford a fair and reasonable presumption of the fact to be tried, it is to be received, and left to the consideration of the jury, to whom alone it belongs, to determine upon the precise force and effect of the circumstances proved, and, whether they are sufficiently satisfactory and convincing to warrant them in finding the fact in issue on it." All these authorities are to the effect, that while an inference of guilt may be drawn by the jury from the fact of recent possession of stolen goods, it is not a presumption of law. The court may determine whether the possession proved is sufficiently recent to put the accused upon his defense. *Rex v. Adams*, 6 C. & P. 600, and other cases cited in Wills on Circumstantial Evidence. "The possession of stolen goods, recently after their loss, may be indicative, not of the offense of larceny simply, but of any more aggravated crime which has been connected with theft; upon an indictment for arson, proof that property, which was in the house at the time it was burnt, was soon afterwards found in the possession of the prisoner, was held to raise a probable presumption, that he was present and concerned in the offense." Wills, 70. But would a court declare that the law presumed from that fact, that he was the incendiary? The circumstance is nearly, if not quite, as strong evidence of the guilt of the arson as of larceny. It is but circumstantial evidence in either case, of no higher dignity in the one than in the other, and that in a prosecution for larceny, it should be held to raise a legal presumption of guilt, whereas, in a prosecution for arson, the same fact would be

held to be only a circumstance tending to prove guilt, is a distinction without any foundation in principle or reason.

Whether the possession of stolen property is sufficient to authorize a conviction, depends upon so many collateral circumstances which the jury are at last to pass upon, and even if very recent, the character and past life of the accused may be so irreproachable as to be strongly against the accusation, that no legal presumption can, or should be based upon such possession. That the error is hoary with age gives it no sanctity, but that it has no support in reason, affords ample ground for its extermination as an anomaly. Nor is such a return to correct principle to be characterized as a "bold innovation." It is the elimination of a " bold innovation" from our criminal law, which has marred its harmony and consistency. The correct doctrine will not help a thief to break through the meshes of the law, while the false doctrine asserted in this instruction, may greatly embarrass an innocent man in his defense.

The instruction is equally faulty in casting upon the accused the burden of proving his innocence. We held in the *State v. Wingo*, 66 Mo. 181, that the burden throughout is upon the State to prove guilt. That the burden never shifts; and yet, because the State has proved one circumstance, tending however strongly, to prove the accused guilty, the burden is then thrown upon him by this instruction to disprove his guilt by a preponderance of evidence. In other words, by such preponderance of evidence, to show that his possession was not a guilty possession. It is not sufficient, that he proves facts which may beget a reasonable doubt of his guilt in the minds of the jury, but the presumption of innocence is overcome and the burden of proving it is shifted and imposed upon the accused. In the *State v. Babb*, 76 Mo. 508, involving these questions, I am marked as concurring, but this was through mistake. I have never assented to the doctrine held by the court in that case. The weight of authority supports the proposition that the recent possession of stolen property affords no

presumption, either of law or fact, which the court may declare to the jury that the person so in possession, stole it, but is only circumstantial evidence of guilt. The following are a few of the cases which announce it. *State v. Raymond*, 46 Conn. 345; *State v. Hodge*, 50 N. H. 510; *Ingalls v. State*, 48 Wis. 647; *Conkright v. People*, 35 Ill. 204; *The People v. Ah Ki*, 20 Cal. 177; *People v. Chambers*, 18 Cal. 382; *People v. Levison*, 16 Cal. 98; *Stokes v. State*, 58 Miss. 677; *Belote's case*, 36 Miss. 96; *Henderson v. State*, 70 Ala. 23; *Sahlinger v. People*, 102 Ill. 241; see also Whart. on Crim. Law, § 728 and 728 b; in the latter section he says: " The inference to be drawn from the possession of stolen goods is not one of law, but of probable reasoning, as to which the court may lay down judicious tests for the guidance of the jury, but can impose no positive binding rule."

For the reasons herein assigned, and upon the foregoing authorities, with the utmost deference to my associates, who are of a contrary opinion, I think the judgment should be reversed. Hough, C. J., has always entertained the views here expressed, and concurs in this opinion.