State v. Good.

THE STATE v. GOOD, *Appellant*.

Division Two, January 21, 1896.

1. **Practice, Criminal**: DEFENDANT TESTIFYING: ADMISSIONS.    A defendant in a criminal cause testifying in his own behalf who failed to deny incriminating testimony of the state's witnesses will be held to have admitted its truth.

2. ———: CHANGE OF VENUE: ARRAIGNMENT.   Where a change of venue has been granted in a criminal cause, the defendant may be arraigned after the cause has reached the county to which the change was awarded.   Revised Statutes, 1889, section 4167.

3. ———: LARCENY: RECENT POSSESSION OF STOLEN PROPERTY: ALIBI: INSTRUCTION.   It is proper to instruct that where property admitted to have been stolen was found in the exclusive possession of one recently after being stolen, such person will be presumed to be the thief, and the burden is on him to overcome the presumption to the satisfaction of the jury, "but not beyond a reasonable doubt," and unless such presumption is overcome to their reasonable satisfaction by explaining such possession, or by evidence of good character, or of an alibi, or by one or more of the kinds of evidence "just mentioned," the jury should find him guilty.

4. ———: REASONABLE DOUBT: INSTRUCTION.   An instruction authorizing an acquittal in a criminal trial upon a reasonable doubt of guilt and declaring that such doubt must be "fairly deducible from the evidence considered as a whole," and that "the mere possibility that defendant may be innocent will not warrant an acquittal on the ground of a reasonable doubt," is proper.

5. ———: ———: ———.   An instruction as to reasonable doubt need not be applied *seriatim* to each item of evidence in the case, but it is sufficient to give a general instruction on the subject applicable to the whole evidence.

6. ———: ORAL DIRECTION: INSTRUCTION: REJECTED TESTIMONY. An oral direction by the court to the jury not to consider rejected testimony is not an instruction and is not improper.

7. ———: EVIDENCE: SELF-SERVING ACTS. Conduct of an accused, after his arrest, tending to show his innocence is in the nature of a self-serving act, and evidence of it is inadmissible in his behalf upon the trial.

8. ———: APPLICATION FOR CONTINUANCE: INTENDMENTS: DILIGENCE. No favorable intendments are indulged in favor of an application for continuance in a criminal cause. It must be more carefully drawn than a pleading and not state conclusions of law, but state specifically the facts relied on, and it must be determined, not only with reference to the sufficiency of the words employed in it, but with regard to the surrounding circumstances before and at the time made, in order that it may be known what, if any, diligence was used.

9. ———: ———: ABSENT WITNESSES: DILIGENCE. Where defendant was indicted May 9, and granted a continuance to the September term, when he was awarded a change of venue to another county in which court convened November 12, and his trial began December 3, an application for a continuance at the latter date, to procure the testimony of witnesses who had left the state, was properly denied, where such witnesses were present at the September term and were not recognized to appear at the trial; that they formerly lived twelve miles distant and subpoenas were not issued for them until November 15, and it was not shown that defendant did not know that they intended to leave the state, or that their evidence was material.

10. ———: ———: ———: ———. Due diligence requires that a defendant who knows of the intention of his witnesses to leave the state, should take their depositions before their departure.

11. ———: ———: ABSENT SICK WITNESS: APPELLATE PRACTICE. The discretion of the trial court in denying a continuance to enable a party to procure the testimony of a sick witness will not be disturbed on appeal, where it appears that other witnesses could have been obtained equally as competent as the absent witness, to testify upon the same subject-matter.

12. ———: ———: COUNTER AFFIDAVITS. The truth of allegations made by an applicant for a continuance as to what the testimony of the absent witnesses would be, can not, it seems, be controverted by counter affidavits.

13. ———: ———: AMENDMENT. It is not the practice to allow an amendment to an application for a continuance, and, if it were, it is a matter that should rest in the discretion of the trial court.

*Appeal from Bates Circuit Court.*—HON. JAMES H. LAY, Judge.

AFFIRMED.

*B. G. Boone, Jno. H. Lucas,* and *R. E. Lewis* for appellant.

(1) The court manifestly erred in refusing to grant a continuance on defendant's application. *State v. Dawson,* 90 Mo. 149; *State v. Bradley,* 90 Mo. 160; *State v. Berkley,* 92 Mo. 41; *State v. Neiderer,* 94 Mo. 79; *State v. Warden,* 94 Mo. 648; *State v. Loe,* 98 Mo. 609; *State v. Maddox,* 117 Mo. 667. (2) The court erred in refusing to issue attachments for the absent witnesses. Const. of Mo. 1875, art. 2, sec. 22; *State v. Berkley,* 92 Mo. 41, and cases cited; *State v. Jennings,* 81 Mo. 185 (dissenting opinion); *State v. Warden,* 94 Mo. 648. The importance and materiality of their testimony is conclusively shown by the record. (3) The testimony of Thomas Day was important, vital, material, and valuable in establishing good character. It is conceded that defendant had unavailingly exerted all reasonable effort and diligence to obtain the attendance of this witness. But the court refused him an attachment, denied him a subpoena, and overruled his application for a continuance. Notwithstanding the very large discretion accorded the trial court as to granting or refusing continuances, it is difficult indeed to find any just or legal apology for the action of the court in this respect under the facts and circumstances of this case, or to escape the conclusion that his discretion was improperly and unjustly exercised to the manifest prejudice of the defendant. *State v. Farrow,* 74 Mo. 531; *State v. Dawson,* 90 Mo. 149; *State v. Bradley,* 90 Mo. 160; *State v. Warden,* 94 Mo. 648; *State v. Loe,* 98 Mo. 609; *State v. Jennings,* 81

Mo. 185; *State v. Berkley*, 92 Mo. 41; *State v. Maddox*, 117 Mo. 667. (4) The court erred in giving instruction number 2 on part of the state; said instruction is not a correct declaration of the law applicable to this case, is indefinite, uncertain, and calculated to confuse and mislead the jury. *First.* In the concluding part of the first paragraph of said instructions the terms "but not beyond a reasonable doubt," are improperly and incorrectly employed. *Second.* The second paragraph of this instruction is also erroneous in that it limits the evidence to be considerd by the jury to that "just mentioned," which only refers to that of good character or being at his father's house at the time the cattle were stolen, and it also assumes that the cattle were stolen. (5) The court erred in giving instruction number 5 on reasonable doubt. The definition of a reasonable doubt is not correctly defined in this instruction and is calculated to mislead and confuse the jury.

*R. F. Walker*, attorney general, *Morton Jourdan*, assistant attorney general, *C. C. Dickinson*, *P. A. Parks*, and *W. E. Owens* for the state.

(1) There is no merit that the defendant was improperly arraigned in Bates county; it was immaterial in which county the defendant was arraigned; the only question being, was such arraignment prior to his trial. *State v. Renfrow*, 111 Mo. 596. This being true, it is immaterial whether the defendant was actually arraigned in Henry county before the change of venue; however, if the defendant had actually been arraigned in Henry county, and the clerk had omitted to make the entry upon the record, then the circuit court judge in that county had the right to correct the record by a *nunc pro tunc* entry. (2) Instruction number 2 was a correct declaration of the law and the court very prop-

erly inserted the words "reasonable doubt." . Instruction number 5 correctly defined "reasonable doubt." (3) The attempt to prove by the witness Faris that defendant made efforts to find Crats, from whom he claimed to have bought the cattle, was an effort to prove self-serving acts of the defendant and was incompetent. (4) The court did not err in overruling the application for a continuance. The state procured the attendance of the witness Campbell and there were other witnesses competent to testify to the subject-matter of the absent witness Day's testimony and if the witnesses Lingo and Mrs. Hedges had testified to the facts set out in the affidavit, their testimony would have been wholly immaterial and irrelevant. The overruling or determining of an application for continuance is legally within the discretion of the trial court, and the supreme court will only interfere with that discretion and reverse a judgment on appeal here when it affirmatively appears that such discretion has been unsoundly or oppressively exercised and abused. In other words, as stated by Judge SCOTT, in *Jacob v. McLean*, 24 Mo. 40: "When a party seeks to substitute the discretion of this court for that of the court below and to get relief under circumstances which, in the discretion of that court does not entitle him to it, he must present a strong case. *State v. Dettmer*, 124 Mo. 426; *State v. Parker*, 106 Mo. 223; *State v. Bailey*, 94 Mo. 313; *State v. Day*, 100 Mo. 242; *State v. Banks*, 118 Mo. 117. It is conceded in the application for continuance that at the time of the trial and when the subpoenas were issued that the Lingoes and Mrs. Hedges were absent from the state, but it is not stated by the defendant that he was without knowledge that they intended to go or had gone. He simply states that his first information of their absence was on the third day of December, 1894. If he had known or been advised of their intention, it

became his duty to take their depositions. *State v. Carter*, 98 Mo. 181. The affidavit does not show even the probability that the defendant would be able to procure the attendance of the absent witnesses at the next term. *State v. Alred*, 115 Mo. 473; *State v. Banks*, 118 Mo. 117. Every presumption will be indulged in favor of the correctness of the trial court in granting and refusing continuances. *State v. Gamble*, 108 Mo. 500; *State v. Luke*, 104 Mo. 563; *State v. Pagels*, 92 Mo. 300; *State v. Jewell*, 90 Mo. 467. The court very properly permitted the state to file counter affidavits. *State v. Dettmer*, 124 Mo. 426; *State v. McCoy*, 111 Mo. 517; *State v. Bailey*, 94 Mo. 311.

SHERWOOD, J.—The defendant was indicted in Henry county for stealing a "bunch" of fifteen head of cattle, the property of Jacob Showalter. Not desiring to be tried in the county of his residence where he had lived for over twenty years, defendant secured a change of venue to Bates county, where, upon trial, he was convicted of the crime of which he was accused, and his punishment assessed at two years' imprisonment in the penitentiary.

The testimony in substance discloses this state of facts: On the night of the twenty-seventh of March, 1894, one Jacob Showalter, a farmer residing near Lewis station, in Henry county, Missouri, was the owner of a bunch of cattle of about forty-two head; on that night fifteen of his cattle, all dehorned, and among which was a black steer and a blue roan steer (the bunch of the tail of the black steer having been cut off) were stolen. About 9 or 10 o'clock that night this bunch of fifteen cattle were seen being driven along a lane leading from the feed lot of Showalter; that there was but one man in charge, and he was on horseback; that the cattle were being driven in the direction of

Clinton; later the same night this same bunch of cattle were seen passing through one of the streets of Clinton, in the direction of the railroad stock yards, which were in the south part of town, in charge of a very tall man. It is shown by the testimony that the person in charge of the cattle when he got within a block of the stock yards lost his way, and seeing a light in the house of witness Stone, who resided near the stock yards, he borrowed the services of Stone to assist him in placing the cattle in the pen. Stone positively identified the defendant as the party in custody and in charge of the cattle. It is also shown that Stone was up that night with a sick child, and that after assisting the defendant in placing the cattle in the Gulf railroad stock pens, the defendant paid him $1 for his services. The defendant is shown to have been six feet, three inches high, with prominent features, and once seen would easily be remembered and readily identified.

It is also shown by the testimony that the defendant came to Clinton on the morning of the twenty-eighth from Lewis station on a freight train, and that he employed Boyles and Royston, both negroes, to aid him in loading the cattle, arranging with Royston very shortly after getting off the train at the southwest corner of the public square and about three fourths of a mile from the stock pen. Witness Boyles testified that the defendant stated to him that he got a man to help him the night before to get the cattle in the stock yards, thus corroborating the testimony of witness Stone; that the defendant said to him that he got in late with the cattle that night. Witness Royston testified that the defendant told him that he gave a man $1 the night before to show him into the stock yards. The description of the cattle given by these two witnesses corresponds exactly with that given by Showalter, the owner; these cattle were shipped by the

defendant to Kansas City over the Gulf railroad and sold to the George W. Campbell Commission Company.

It is shown by the testimony, at the time these cattle were stolen, that the defendant had no cattle and was overdrawn at the bank at which he did business, the Brinkerhoff-Farris Trust and Savings Company, and was the owner of very little personal property and had no real estate. His explanation of the possession of these cattle was that he happened down at the stock yards that morning and bought the cattle from an old man who claimed to have driven them up from southeast of Clinton, who gave the name of *Thomas Crats*, an entire stranger; that he bought them for $2.60 per hundred and gave *his check* for the amount on the Brinkerhoff-Farris Bank; although defendant had promised Crats the *money*, the latter made no objection to receiving the check; that he had seen the party once since the purchase of the cattle, and though under arrest for larceny himself, took no steps to have him arrested. It is shown that the check was never presented by Crats, but that a certain check, which the defendant identified as the check given Crats, came through the mail inclosed in an envelope without any directions as to its proceeds or disposition thereof, or any instructions whatever to the Kansas City Trust Company at Osceola, which was the correspondent of the Brinkerhoff-Farris Bank; that the envelope which contained this check was postmarked at Lowry City, a postoffice in St. Clair county. It is shown by the testimony of the cashier and assistant cashier that the envelope was either lost or destroyed.

It is further shown that prior to the shipping of these cattle the defendant had ordered from the agent of the Gulf railroad a car for the shipment of cattle on Monday, March 25, 1895; that when he came in on the freight train on Wednesday, he induced one Newman,

who was on the train with him, to get off at the Weaver hotel up town; that he stated to Newman that he had business at the Missouri, Kansas & Texas depot; it appears, however, that he went directly to the Gulf depot and saw Smith, the agent, and told him he had been delayed by high water, and that he had gotten in during the night, which testimony corroborates Stone, Boyles, and Royston's testimony. It is also shown by the testimony that on March 26 he ordered of the agent Roberts, of the Missouri, Kansas & Texas railroad, two cars for the shipment of cattle on the twenty-seventh. He failed, however, to use these cars, and in explanation to agent Roberts, stated that the cattle had stampeded in St. Clair county, and that there were just enough left of them to ship to Kansas City.

It is shown that the defendant went to Kansas City in a caboose; that he lay down and apparently went to sleep; that he had conversation with several parties who were on the train at the time. To one O. W. Griffith, of Cass county, he stated that the cattle were of his own feeding; that he had still others to ship. Griffith identified the defendant. Rev. J. W. Harwood testified that he was on the train with the defendant; that the defendant told him he had driven the cattle in from the country the night before and complained that he did not get off as soon as he expected; that he had fed or raised the cattle, and thinks defendant told him that he had driven in the cattle himself. On cross-examination, Harwood testified that the defendant said to him: "I drove them in the night before." D. S. Staley was on the same train and testified to the same effect, with the addition, that the defendant told him he had gotten the cattle from an old neighbor somewhere near Clinton. It is shown by the testimony of witness Hunter, clerk in the Brinkerhoff-Farris Bank, that the defendant was at the bank the morning the cattle were shipped

before he could have possibly been to the stock pens; that he told Hunter he had bought a car load of cattle and had them in the pens ready to ship to Kansas City that day; that he said nothing to him about the check for the cattle, and was overdrawn at the bank at that time $38. The cattle brought $649.25 and the check was for $400 and some odd dollars.

It is shown by the testimony that the defendant was at Lowry City during the summer of 1894, where the letter was mailed containing the check, and had a talk with one C. W. Nesbit; that he told Nesbit that he had found the man who had sold him the cattle, and also about the check and the mailing of it. Witness Leonard testified that the check was received on May 17 in an envelope with no instructions or anything else in it, and he thinks the envelope was thrown into the waste basket.

The defense was that of an *alibi* and the contention of the failure upon the part of the state to identify the cattle. It is claimed by the defendant that he was at home during the night of the larceny; that he retired early that night with a brother, and it is shown that he was there the next morning; but there was a door leading from the room he occupied out into the yard, and all these facts might be true, and yet the defendant could have left his home that night and stolen the cattle and driven them to Clinton and placed them in the stock pens and been at home the next morning, as the evidence introduced upon his part tends to show. An attempt was made to show a good character and reputation for the defendant, but after the introduction of a few witnesses they were forced to abandon that issue, and the state successfully assailed his reputation for truth and veracity.

The testimony in this case shows that the cattle were stolen from the feed lot of the owner on the night

of the twenty-seventh of March; that they were driven to Clinton and with the help of the witness Stone, were placed in the stock pens, and on the next day shipped by the defendant to Kansas City. It is shown that no cattle answering the description of these were raised or being fed southeast of Clinton, as the defendant says Crats informed him at the time of the alleged purchase; but the testimony clearly shows that the cattle were driven from Showalter's feed lot to the Gulf stock pens at Clinton, and the fact that in the morning the defendant shipped them to Kansas City and sold them. In fact, from reading the testimony in this case, it will be seen that in the face of all the positive and substantial evidence and the contradictory admissions and confessions of the defendant that absolutely no defense was left him; the testimony as to a mysterous man selling at a low figure, never having been seen or heard of before that day nor since, presenting a check in the manner in which the testimony shows this check was presented, was a story difficult of belief. The claim of the defendant to have seen east of Lowry City, the man from whom he purchased the cattle, and his admissions that even though under arrest himself at the time, he made no effort to have him apprehended, to identify him or talk with him in the presence of anyone, seems contrary to all human experience.

It was conceded by defendant's counsel upon the argument that there was sufficient testimony to warrant the conviction of defendant, and in the light of the testimony already recited, this was a very natural concession to make. Besides, defendant took the stand as a witness, and did not attempt to deny the damaging testimony of Stone, Boyles and Royston, which fastens the commission of the crime upon him in the most indisputable manner. The testimony of these witnesses not being denied, must be taken as admitted by defend-

ant. *State v. Musick*, 101 Mo. *loc. cit.* 271; *State v. Patrick*, 107 Mo. *loc. cit.* 174; *State v. Alexander*, 119 Mo. *loc. cit.* 461; *State v. Paxton*, 126 Mo. *loc. cit.* 514.

Several errors have been assigned for a reversal of the judgment herein.

There was no error in allowing defendant to be arraigned after the cause reached the Bates circuit court. · Under express statutory provisions when a cause has thus been transferred, "the same proceedings shall be had in the cause in such court, in the same manner and in all respects, as if the same had originated therein." R. S. 1889, sec. 4167; *State v. Renfrow*, 111 Mo. *loc. cit.* 597.

Complaint is made of the second instruction given at the instance of the state, as follows:

"If the jury believe from the evidence beyond a reasonable doubt that the cattle mentioned in the indictment were stolen from Jacob Showalter, as alleged in the indictment, and that soon thereafter such cattle were found in the exclusive possession of defendant Good, then, and in that event, the defendant is presumed to be the thief, and the burden is on him to rebut or overcome such presumption to your satisfaction, but not beyond a reasonable doubt. And unless such presumption is overcome to your reasonable satisfaction by evidence in the case explaining such possession in a manner consistent with his innocence, or by evidence of defendant's good character, or by evidence that the defendant was at his father's house at the time the cattle were stolen, or by the combined weight of one or more of the kinds of evidence just mentioned, you should find the defendant guilty."

No serious objection to this instruction is seen. It was proper to add the words "beyond a reasonable doubt," at the end of the first clause of the instruction;

otherwise the jury might have been misled as to the manner and extent defendant should overcome the presumption arising from the recent possession of stolen property. And the words "just mentioned" in the second clause of the instruction evidently refer to *all* the kinds of evidence theretofore described. And as to the assumption that the cattle of Showalter were stolen, the fact is not in dispute.

Nor is instruction 5 given for the state obnoxious to the attack made upon it. The term "reasonable doubt," is defined in the customary way, and the jury told that such doubt, in order to authorize acquittal, "must be one fairly deducible from the evidence considered as a whole," etc. It has been repeatedly held by this court that an instruction as to reasonable doubt need not be applied *seriatim* to each item of evidence in the case, but it was sufficient and proper to give a general instruction on the subject applicable to the whole mass of testimony. As these instructions are the only ones criticised, it is unnecessary to notice the others given at the instance of the state except to say they were in usual and approved form.

The instructions given at defendant's request, were these:

"6. If you believe from the evidence that the defendant was at his home on the night of March 27, and the cattle of prosecuting witness were stolen on that night, then you must acquit even though you believe that the cattle subsequently were found in possession of defendant.

"7. The court instructs the jury that unless you believe beyond a reasonable doubt that the cattle shipped to Kansas City were the property of the prosecuting witness, Showalter, you will acquit.

"8. If you have a reasonable doubt as to whether defendant was at home or absent therefrom on the

night of March 27, you will give the benefit of the doubt to the defendant and acquit.

"9.   While it is true that the crime may be proven by circumstantial evidence as well as by direct testimony of eyewitnesses, yet the facts and circumstances in evidence must be consistent with each other and with the guilt of the defendant, and, further, must be inconsistent with any reasonable theory of defendant's innocence."

It is claimed that the court erred in giving an *oral* instruction in these words:   "I caution you gentlemen to distinguish between questions asked by counsel and the answer excluded by the court, and the matters testified to on the stand by permission of the court."

It was certainly not improper to tell the jury in effect that answers of witnesses excluded by the court should not be considered by the jury, while those matters testified to by witnesses with the permission of the court, were entitled to consideration.  Such remarks as to the exclusion of testimony, are customarily made by courts when trying causes, and are not to be regarded as instructions.

There was no error in excluding the testimony of Faris as to he and defendant going to Osceola and Lowry City, and inquiring after Crats, the supposed holder of the check given in alleged payment of Showalter's cattle.  This trip was taken along in May, weeks after defendant had been arrested, and the evidence offered purely of a self-serving nature.

Other objections taken in regard to the introduction of evidence possess no more merit than the one already mentioned, and will not be further noticed.

The remaining point for consideration is whether the ruling was correct which denied defendant's application for a continuance.  Regarding such applications, the rigid rule prevails that they are to receive no favor-

able intendments. Such an application must be drawn more carefully than a pleading, and must state the *facts* relied on specifically, and not mere conclusions of law. 2 Elliott's Gen'l Prac., sec. 484; Kelley's Crim. Law [2 Ed.], sec. 340; *State v. Pagels*, 92 Mo. 300.

And this application must be considered, not only in respect of the sufficiency of the *words* employed therein, but also in the light of the surrounding circumstances at and before the application was made, in order to determine what, if any, diligence was shown.

Defendant was indicted on the ninth day of May, 1894, in the Henry circuit court. On the next day he gave recognizance for his appearance from day to day and from term to term, and on the same day as the record shows, *he applied for, and obtained, a continuance until the next, or September, term of the Henry circuit court.* When that term of court convened, and on the eleventh day of September, defendant applied for, and obtained, a change of venue to Bates county, on account of the prejudice of the inhabitants, where the court convened on the second Monday in November, 1894, the twelfth day of that month. On the third day of December the state announced ready for trial, whereupon defendant filed his application for a continuance. This was three weeks after the term began, and yet, according to the application, defendant had never learned *until that day*, of the absence of his witnesses, notwithstanding the subpoenas were on file, showing that the witnesses could not be found. *When* these subpoenas were returned is not stated. These subpoenas were not issued to the officers until the fifteenth of November, 1894, which was three days after the Bates circuit court convened. And yet three witnesses on whose testimony defendant appears most to rely lived in Johnson county, only about twelve miles north of where defendant lived. He states in his application they, Harvey

Lingo, Mrs. Lingo, and Mrs. Hedges, were in attendance at the September term of the Henry circuit court. If so, then defendant could have had them recognized to appear at the Bates circuit court, under the provisions of section 4183, and it was but the part of due diligence to secure their attendance in this way.

But *when* did those witnesses leave the state, and was *defendant aware of their intended leaving?* If he was aware of their intention in this regard, then due diligence required that he should have taken their depositions, which he might have done. R. S. 1889, sec. 4147; *State v. Carter*, 98 Mo. *loc. cit.* 180. From aught that appears to the contrary in the application, (and no intendments are to be taken in its favor) defendant knew when those witnesses intended leaving the state, and yet neglected to take the precaution before mentioned.

More than that, it does not appear from the application that, even if those witnesses were present, their testimony would have availed defendant, because it does not appear whether the description of the cattle seen by those witnesses corresponded so closely with those stolen from Showalter as to indicate that they were *prima facie* and probably the same cattle. Showalter's cattle were *all* steers, and *dehorned*, and those mentioned in the application were "about fifteen head" only *two* of them *steers*, "one a black and one a blue steer, the others mixed red and white spotted." Whether these cattle were *horned* or *dehorned* does not appear. If the *former*, then if corresponding in color, size, etc., they would not answer the description of Showalter's cattle. Furthermore, the facts in evidence show that by no possibility could the cattle which passed by Lingo's house have been the cattle seen by Lingo and others, for the reason that the application

states the witnesses saw the cattle "within a very short time after it is alleged the cattle were stolen." Now, Showalter's cattle were *not known to have been stolen*, that is to say, *he* did not discover it, until on Sunday afternoon the eighth day of April, 1894, while Showalter's cattle were stolen on the night of the twenty-seventh of March, 1894, and no search was made for the cattle until the ninth of April, nor were they suspected to have been stolen till several days after that. So that, looking at defendant's application from every point of view, it shows no diligence and possesses no merit. And in this connection it is not to be forgotten that as before stated defendant had been granted a continuance at a former term as shown by the record.

As to witness Day, who was detained by sickness, and whose testimony was wanted to establish that "defendant, his father and mother, sister and brothers, during many years, and that they have at all times stood well in the community as law-abiding, honest, upright, moral people, with no accusations of any character or description against them whatever." Due diligence was used to procure the attendance of this witness, but he was detained it seems by sickness. But as the testimony of Day was only as to character and as Day had lived in the same neighborhood for twenty years or more, we will not assume, since the lower court has ruled on the point, that there were no other witnesses whose attendance could have been secured to testify on the same point and to as full an extent as would the witness Day, provided of course that the facts existed warranting such testimony.

Viewing the matter in this light it is unnecessary to consider the force and effect of the counter affidavits filed herein. Such affidavits, it seems well settled, and our own decisions do not appear to have gone beyond this, are not permitted to controvert the truth of the

allegations made by the applicant for a continuance as to what the testimony of the witnesses would be, and this seems to be the general rule where counter affidavits are allowed, except where fraud or imposition is suggested, or there is good reason to believe the object is delay. 2 Elliott's Gen'l Prac., sec. 484, and cases cited; *Hyde v. State*, 67 Am. Dec. 630.

It has been suggested that an amendment to the application should have been permitted, but this is certainly not the usual practice, and if it were, this is a matter which should rest in the discretion of the court.

In conclusion, this case exhibits as bold and flagrant a violation of the criminal law and of the eighth commandment, as courts are ordinarily called on to pass upon. Judgment affirmed. All concur.