# THE STATE v. MACK MAGGARD, Appellant.

### Division Two, May 20, 1913.

1. **LARCENY: Substantial Evidence: Matter for Jury.** Where there is substantial evidence of defendant's guilt of stealing the horses, and also substantial evidence that he is not guilty, and the evidence is in such shape that if the State's is true he is guilty, and if defendant's is true he is an innocent and persecuted man, the question of his guilt was a matter for the jury, whose province it is to determine the credibility of witnesses in a law case.

2. ————: **Recent Possession of Stolen Property: Presumption.** The possession of a stolen horse recently after the theft, and the sale thereof, by defendant, is a circumstance coupled with a presumption, which impose upon him the duty to satisfactorily account therefor.

3. **CIRCUMSTANTIAL EVIDENCE: Instruction.** An instruction upon circumstantial evidence should substantially advise the jury that the circumstances proved must be consistent with each other and with the hypothesis that the defendant is guilty, and inconsistent with the theory of his innocence and with every reasonable hypothesis except that of guilt. And an instruction which tells the jury that "before you can convict the defendant on circumstantial evidence alone, the facts and circumstances must all form a complete chain and point directly to the defendant's guilt and must exclude every reasonable theory of defendant's innocence," while inartistically drawn, meets the requirement of the rule.

4. **EVIDENCE: Acta Inter Alios: Lugged in by Appellant.** Where appellant has lugged into the case matters inadmissible, he cannot complain that the witness in redirect examination repeats the statement. An error courted by appellant, or induced by his action, or brought about *ex necessitate*, becomes a part of the interlaced facts and is not reversible error. Where there were two horses stolen, one of which was soon afterwards in the possession of defendant Maggard and the other in the possession of his brother, both of whom are jointly indicted for the larceny, a witness for the State who had bought one of the mares from the brother was asked on cross-examination why he had stated to a witness for defendant that the mare he had bought from the brother was a stray, and replied: "Mr. Maggard told me if I told anything about this he would blow my head off." *Held*, that it was not reversible error for the State to ask the witness on redirect examination: "I will ask you if about that time your life was threatened if you told where you got this

mare?"—for several reasons: *first*, the context shows that the "Mr. Maggard" who had threatened the witness was not the defendant, but his brother, and it was therefore harmless error; *second*, the question related to *res inter alios*, and was, therefore, inadmissible, but it was induced by defendant's question, and hence he cannot complain; and, *third*, the threat interlinked itself with defendant's theory of defense.

5. ———: Impeachment: Rehabilitation: Cognate Acts and Statements. Where a witness is impeached by proof of variant. acts and statements, relevant evidence of the witness's prior statements corresponding with his testimony are admissible for the purpose of rehabilitation. Where two mares were stolen, and one was afterwards in defendant's possession and the other in his brother's possession, and defendant's theory is that one Compton stole both and sold them to him and his brother, and Compton testified for the State that he bought one of the mares from the brother and when he afterwards learned she had been stolen returned her to him, and defendant undertook to impeach Compton by detailing various statements made and acts done by him, it was not error to permit the State in rebuttal to sustain and rehabilitate Compton as a witness by permitting another witness to testify that Compton had engaged him to keep a lookout for and buy a horse for him and had later told him before the theft of the mare became public that he had bought a horse from defendant's brother and that he need not therefore keep a further lookout for a horse for him.

6. ———: ———: By Acts and Statements: Rehabilitation by Proof of Reputation. Where defendant has sought to impeach a State's witness by proof of his former acts and statements, the State is entitled to prove by witnesses that the general reputation of the witness for honesty, truth and veracity is good.

Appeal from Douglas Circuit Court.—*Hon. John T. Moore,* Judge.

AFFIRMED.

*Dooley & Hiett* and *Patterson & Mason* for appellant.

*John T. Barker,* Attorney-General and *Thomas J. Higgs,* Assistant Attorney-General, for the State.

(1) There was ample evidence to warrant the verdict returned by the jury. The contention that the

verdict was against the evidence is without any merit and does not deserve the consideration of this court. (2) That the verdict of the jury is against the law as declared in the instructions given by the court is a contention that could not be seriously argued in this case and was only raised by appellant as a matter of form. (3) The court instructed the jury on all the necessary points of law in the case as required by statute and in acordance with the many decisions of this court. State v. Conway, 241 Mo. 285. (4) The court did not err in admitting irrelevant, illegal and incompetent testimony on the part of the State.

FARIS, J.—Defendant was indicted in the circuit court of Douglas county for grand larceny; being convicted and his punishment being assessed at imprisonment in the penitentiary for a term of four years, after the usual procedure in such cases provided, he has taken and now prosecutes this appeal.

The larceny specifically charged was horse stealing. Defendant was jointly charged in this behalf with four others, but upon the defendant's application therefor, a severance was granted to him and he was separately tried on September 26, 1912.

The horses alleged to have been stolen were the property of one Orey Bennett, who resided about four miles from the town of Vanzant in Douglas county. Some three weeks prior to the alleged theft, defendant, with one of his co-defendants, Abe Emery, came into the neighborhood in which said Bennett resided, for the purpose of purchasing cattle, and while so engaged remained in that neighborhood about a week, boarding with one Johnathan Emery, the brother of Abe.

The cattle which defendant and Emery purchased were kept in the lots of said Bennett. The defendant, it appears, must have become well acquainted with one

250 Mo.—22

of the stolen horses; namely, a certain mare, called in the testimony, a "solid sorrel mare;" for there is proof that he offered to trade a gray horse which he was then driving for said sorrel mare of Bennett's.

Defendant Maggard and Emery left this neighborhood with their cattle about the 22nd of June, 1910, and on the night of July 13, 1910, the two mares of Bennett, which are alleged in the indictment to have been stolen, disappeared. Search was made extensively for these mares and some two months later one of them, called in the testimony "the sorrel mare with the white face," was found in Ozark county; and some eighteen months thereafter, to be exact, in February, 1912, the "solid sorrel mare" was found in the pasture of Dave Coram in Linn county in this State. The testimony shows that Coram purchased this mare from defendant sometime about the last of September, 1910; that about the 25th of August, preceding, defendant had come to the farm of one A. H. Stone, a neighbor of Coram, and whom defendant had known years before, and began work for Stone as a farm hand. Defendant, during the summer of 1910, made his home with his brother, Will Maggard, who is his co-defendant here, and who resided somewhere in Greene county. On the farm of Will Maggard, the proof tends to show, in the early days of August, 1910, at a secluded place, near some empty buildings, and in a small hollow among the bushes, there were found plain indications of horses having been kept.

The theory of defendant, as is clearly disclosed by the testimony of defendant, who as a witness testified for himself, was that defendant purchased the mare which he afterwards sold to said Coram from one Ed Compton, who resided about three miles east of Springfield, and was apparently a neighbor of Will Maggard, the brother of defendant. The other of the two mares in question, namely the "white faced sorrel mare," was for a time in the possession of said Compton, but

the latter explains his possession of her by saying that he purchased her from Will Maggard, and that upon ascertaining or suspecting that she had been stolen, he turned her back to said Will Maggard. Later this mare was found by one William Lee, a neighbor of Bennett, in the northwest corner of Ozark county, to which place, inferentially—for the record is silent— she seems to have wandered. We say inferentially, because, while the proof shows that this mare was for a month or two in Compton's possession, by reason, he says, of his purchase of her from Will Maggard, he says that he turned her back to Maggard. There is no showing as to the manner in which said Maggard disposed of her.

Defendant, in attempting to account for his possession of the stolen mare, swears, as we have stated, that he met the witness Compton on the public road and gave the latter $90 for her; that he rode her to the farm of Abe Emery, there purchased a buggy and set of harness from said Emery, and on the next morning started to drive to North Missouri. In his drive north he passed through various towns, but does not appear to have tarried long at any of them. He says that he did not even suspect that the mare had been stolen until he returned to Springfield, which occurred about November, 1910, though he admits that he and Emery were in Bennett's neighborhood in the June preceding, and that he saw the mares at that time, though he was unable to, remember whether he offered to trade for one of them or not. Upon reaching Springfield he seems to have been advised that some trouble was brewing about the mares, for he says that he saw the witness Compton and asked Compton about the matter, but was advised by Compton that the trouble was not over the mare which defendant says Compton sold him, but was about the other of Bennett's mares. As to this conversation he is corroborated by one John Ikes, who seems to have no permanent residence at

any place, but is apparently a man of peripatetic pro-clivities who had, just prior to his presence with de-fendant in hearing of the conversation with Compton, come to Springfield from Chicago.

There was much impeachment of the witness Compton by certain witnesses offered for defendant; by laying this horse stealing at his door, and by the fact that Compton had been convicted of petit larceny, which was explained by him as consisting in the theft of a watermelon. There was testimony as to the good reputation of defendant; also testimony in rebuttal by the State of bad reputation, so as to leave the mat-ter of reputation hanging somewhat in doubt.

Other facts, if they shall become pertinent to a full understanding of the points of contention, will be further amplified in our views thereon.

I. We have not been favored with either a brief or an oral argument on the part of defendant. We are compelled, therefore, in performing the duty en-joined on us by the statute (Sec. 5312, R. S. 1909), to have recourse to the motion for a new trial and the mo-tion in arrest in order to determine whether error meet for reversal occurred upon the trial.

Defendant alleges in his motion for a new trial: (a) The insufficiency of the evidence to support the verdict; (b) the misdirection and non-direction of the court in the instructions; and (c) the admission on the part of the State of incompetent testimony and the re-fusal to admit, on defendant's part, competent testi-mony. These in their order.

II. The weight of the testimony was for the jury. The record shows that there was substantial evidence adduced by the State on every point re-quired by law to be proven to make out the guilt of defendant. If the jury believed the witnesses for the State, as it was their province to do,

Conflicting Evidence.

the conviction was proper and is amply supported by the record. If they had believed the witnesses for the defendant, including the defendant himself, they might well have found him not guilty. From the concrete result, it is evident that the triers of fact elected to believe the State witnesses. This was their legal privilege and we are not disposed, under the facts before us, to interfere with their finding. There was a sharp conflict developed by the evidence on many of the crucial points in the case. If the defendant's version is correct, he is an innocent and persecuted human, a sufferer from vicarious punishment rightly the meed of another. But viewing the whole case from afar with a level eye, we cannot say that the jury did not reach a conclusion consonant with the weight and credibility of the evidence. But as we have seen, and not to burden our views with reiteration of citations, which would only lengthen without illuminating this opinion, we end as we began, by saying that the law is settled, which precludes our interference on the grounds urged with the verdict of a jury in a case at law, present substantial proof of every legally required element of a given case. We rule this point adversely to defendant's contentions and hold that the testimony was sufficient to sustain the conviction.

III. The instructions which the court gave and each of them is challenged, and it is urged that the court did not instruct on all of the law

*Instruction: Circumstantial Evidence.* of the case. The court, by the instructions, correctly defined grand larceny, both abstractly and specifically, as having application to the concrete facts in the case; it correctly instructed on reasonable doubt and the presumption of innocence; on the good character of defendant and the weight of his testimony; on the presumptions arising from the recent possession of stolen property, and correctly presented by an apt instruction the the-

ory of defendant's *bona fide* purchase of the stolen horse from the witness Ed Compton.

The evidence was wholly circumstantial. The most damaging circumstance was the possession of the stolen horse and the admitted sale thereof by defendant. Such possession, when recently following larceny, is more than a circumstance, in this, that it is a circumstance coupled with a presumption against defendant, to rebut which defendant is saddled with the duty of satisfactorily accounting therefor, to the triers of fact. [State v. Scott, 109 Mo. 226; State v. Jennings, 81 Mo. 185; State v. Good, 132 Mo. 114.]

Upon the phase of the weight of circumstantial evidence the court gave the following instruction, to-wit:

"Gentlemen of the jury, the State seeks a conviction in this case, on circumstantial evidence, and before you can convict the defendant on circumstantial evidence alone, the facts and circumstances must all form a complete chain and point directly to the defendant's guilt and must exclude every reasonable theory of the defendant's innocence."

An instruction upon the quantum of circumstantial evidence should substantially advise the jury that the circumstances proved must be consistent with each other, and with the hypothesis that the defendant is guilty, and inconsistent with the theory of his innocence and with every reasonable hypothesis, except that of guilt. [State v. Dent, 170 Mo. 398; State v. Moxley, 102 Mo. 374; State v. David, 131 Mo. 380.] Taking the above definition as a fair deduction from what the courts have said and as a fairly accurate statement of the required contents of an instruction on the quantity and quality of circumstantial evidence, and analyzing the instruction actually given, we see that the one complained of here, while inartificially drawn, yet falls within the pale of sufficiency. The court tells the jury that "before you can convict the

defendant on circumstantial evidence alone, the *facts and circumstances must all form a complete chain*" (i. e., must be consistent with each other) "and point directly to the defendant's guilt" (i. e., the facts must be consistent with the hypothesis that the defendant is guilty) "and must exclude every reasonable theory of the defendant's innocence" (i. e., the facts must be inconsistent with the theory of his innocence, and inconsistent with every reasonable hypothesis except that of guilt). It may well be, if we weigh words in ultra-delicate scales, that the court in requiring the triers of fact to "exclude every reasonable theory of innocence" before they found guilt, went, favoring defendant, as far beyond his rightful due as the word "exclude" transcends in its force the word "inconsistent." If this be so, surely defendant may not complain of error committed in his favor. Be these things as they may be, this court has repeatedly approved instructions in this behalf not so strong as the one criticized, and has approved others of similar import. [State v. Hill, 65 Mo. 84; State v. Turner, 106 Mo. 272; State v. Bauerle, 145 Mo. 1; State v. Woolard, 111 Mo. 248; State v. Taylor, 134 Mo. 109.] Ruling this point against defendant's contentions, we may yet suggest in passing, that the beaten paths in law, if there be such, are best, and that verbal excursions into unexplored fields of diction are always hazardous.

IV. During the trial one Ed Compton was called as a witness for the State, chiefly, it would seem, to qualify him for cross-examination by the defense. In his examination in chief he said, and all he said was: "I live in East Springfield and have lived in Greene county for eleven, twelve or fifteen years, may be; I know Bill Maggard and Mack Maggard [the defendant.] I know where one of the mares claimed to be owned by Orey Bennett was. In August, 1910, Mack

Harmless Error: Acta Inter Alios.

Maggard was staying with Bill Maggard; about this time I bought one of the Bennett mares from Bill Maggard and [afterwards] turned her back to Bill Maggard; since this case has been in court I have seen the mare down here in the barn in Bennett's possession.'' This is the whole of his examination in chief, though he was afterwards re-examined, traversing certain testimony *in his cross-examination, which latter covers some fifteen pages of the record.*

All of this is pertinent in the light of the fact that the most serious questions raised upon this appeal grew out of alleged errors in the admission of evidence affecting the testimony of said witness Compton.

Upon the trial the witness Compton was asked: ''Q. When Bill Maggard took the mare, what did he say to you, if anything, about whether you should tell where you got the mare.'' Objection to this question was urged by defendant's counsel and this question was withdrawn without being answered. Thereupon this question was asked by the State: ''Q. I will ask you if about that time your life was threatened if you told where you got this mare?'' Defendant objected unless defendant had threatened the witness. The objection was overruled and defendant saved his exceptions. This is urged upon us as error, for which it is said we should reverse the case. That is was *res inter alios* and inadmissible, goes without saying; but if it was an error courted by the defendant, or induced by his action, or brought about *ex necessitate,* the interlaced facts of the case regarded, it was not so harmful as to cause a reversal. As showing the colorless nature of this witness's testimony in chief, we set it out in full above. The whole record shows that the witness Compton had said nothing that was not shown as well or better by other witnesses for the State. William Maggard was jointly indicted with defendant for the theft of the identical two mares, for the larceny of which defendant was herein convicted. One

State v. Maggard.

of these mares was traced indubitably to defendant's possession. With the other one the objectionable testimony dealt. The theory of the defense was that the witness Compton had stolen them both, and sold one of them to defendant and the other to William Maggard. These things all show the necessary interlacing facts presented in the case, without lawfully justifying, it is conceded, the admission of the statement on the theory of a conspiracy. But the identical statement to which defendant here objects was first brought out, without objection or exception by defendant, in his cross-examination. Being asked by counsel for defendant, in substance, why he had told one Martin, who was a witness for defendant, that the mare which Compton alleged he got from William Maggard, was a stray, he replied : ''Mr. Maggard told me if I told anything about this he would blow my head off.'' The question and answer objected to had reference, as the record clearly shows, to this identical threat. It was brought before the jury first by defendant himself, and not by the State. It went to the jury hours before the objectionable question was asked and answered. It is fundamental that error may not be bottomed on things lugged into the case by defendant himself. Besides, since the answer provoked from the witness by defendant did not clearly disclose whether defendant or William Maggard had threatened him, and since the matter objected to does disclose by its context that the ''Mr. Maggard'' who had threatened him was not defendant, but his brother, we are not able to see why or how defendant was hurt. Being forbidden to reverse except for harmful error, we hold this error was *damnum absque injuria* in a sense and upon the facts, and disallow it.

V. Upon the trial the court permitted the State in rebuttal to offer testimony as to the general reputation of witness Compton for honesty

Impeachment
by Acts and
Statements:
Rehabilitation.
and veracity, and also permitted a witness to testify that said Compton had told the witness, one J. M. Williams, before the theft of the horses became public, that he (Compton) had bought a mare from William Maggard, and that the witness need no longer· keep a lookout for· a horse for him; there was other evidence in the case showing that Compton had requested Williams to keep a lookout for and to buy a horse for him.

Ordinarily, no legal excuse appearing, the admission of this evidence would be error; the gravity of which as to whether reversible error, depending on whether upon the facts we could say as a matter of law that its admission so prejudiced the case of defendant as to have resulted in a denial to him of a fair and impartial trial. Upon the weight of it, or touching the effect of it upon the defendant's case, we need not pass, but will determine the point upon the cold point of law involved as applied to the facts and conditions presented in the case.

This testimony was offered in rebuttal after defendant had closed his case. The defense had sought to impeach the testimony of the witness Compton by almost every means known to the law of evidence, though, as we have stated, the evidence which he had given for the State was colorless and comparatively worthless. The defense had proven the conviction of Compton of petit larceny; they had shown many variant statements *in pais* as having been made by him, and the theory of the defense which was fully developed was that Compton had himself stolen the two horses and sold them to defendant and Will Maggard. This was both the shadow and the substance; the woof and the warp of defendant's case. They assailed him with ''horse, foot and dragoons,'' figuratively—and as it may be said upon the facts here, literally also—alone omitting in their efforts to impeach him and break him

down, impeachment by witnesses as to his general reputation for truth and veracity. Conceding the general rule of inadmissibility, as applying ordinarily to the evidence elicited, does the well-known exception apply upon the doctrine of sustaining or rehabilitating an impeached witness?

We need not here pick and choose with care and nicety, the varying methods known to the doctrine of rehabilitation as dependent upon the manner of impeachment used or sought so to be. All attacks save one, to wit, impeachment by witnesses for bad reputation for truth and veracity, were used.

Where a witness is impeached by proof of variant acts or statements, relevant evidence of the witness's prior statements correspondent with his testimony, are admissible for the purpose of rehabilitation. [State v. Grant, 79 Mo. 113; State v. Hatfield, 72 Mo. 518; State v. Whelehon, 102 Mo. 17; State v. Sharp, 183 Mo. l. c. 735.]

In the case of State v. Sharp, supra, this court said:

"But, even under such circumstances, whether evidence can be introduced of former declarations of the witness to corroborate his testimony at the trial, the authorities are in much conflict. The trend of the decisions of this court, however, seems to be that such declarations are permissible.

"Thus, in the case of State v. Grant, 79 Mo. 113, it is ruled that if an attack be made upon the character of a witness, it is then permissible to prove that the witness had made statements consistent with those made as a witness. That case was followed in the subsequent case of State v. Whelehon, 102 Mo. 17.

"In State v. Taylor, 134 Mo. 109, it is ruled that there is no doubt but that when a witness is impeached by the medium of alleged contradictory statements, evidence may be introduced in rebuttal of statements made by him of a similar character theretofore made

in corroboration of statements made by him on the trial. It is true that the same distinguished judge wrote both these cases, and that in the Taylor case, he said that the rule was stated too broadly in Grant's case, by which he clearly meant that in Grant's case the rule was held to apply to all cases in which the character of the witness is attacked upon any ground, while it only applies in case the witness is attacked upon the ground of having made contradictory statements, and it is sought to impeach him upon that ground.

"In Hobbs v. State, 133 Ind. 404, it is said: ' "If the witness has not been impeached, by proof of his having previously made statements inconsistent with his testimony, there seems to us to be no sufficient reason for the introduction of the corroborating evidence. But it is otherwise, if the witness has been thus impeached; it appears then to be proper to give the party who called the witness an opportunity to support him, by proving that the witness had, on other occasions, stated the facts to be as he represents them in his testimony. There are several cases directly in favor of the admission, under these circumstances, of this corroborating evidence. [Cooke v. Curtis, 6 Harr. & Johns. 93; Lessee of Packer v. Gonsalus, 1 Serg. & Rawle, 536; . . . Lessee of Wright v. Deklyne, 1 Peter's Cir. Ct. 203; People v. Vane, 12 Wend. 78.]" We may add to the citations of Mr. Justice BLACKFORD the more recent cases of Dailey v. State ex rel., 28 Ind. 285; Brookbank v. State ex rel., 55 Ind. 169; Hodges v. Bales, 102 Ind. 494; Dodd v. More, 92 Ind. 397; Carter v. Carter, 79 Ind. 466. The appellants further contend that if corroborative statements may be proven under such circumstances, the impeached witness should not be permitted to testify to such statements. We know of no statute or rule declaring such witness incompetent, and, under the practice prevailing, the trial court or jury being the judges of the credibility

of the witnesses, and being enabled to weigh his testimony in the light of his impeachment, we can see no good reason for excluding him as a witness.'

"Now the facts with respect to this question, as disclosed by the record, and as conceded by defendant, show beyond any question that the object of defendant in introducing the deposition of the witness was for the purpose of impeaching him by showing that his testimony upon the trial was inconsistent and in conflict with what he stated in the deposition with respect to the same matter, by reason of which defendant insists that he stood 'fairly and squarely impeached.' It thus clearly appears that the facts disclosed by the record bring this case within the exception to the general rule, and that the court did not err in admitting in evidence the testimony of Mrs. Dooley."

We are constrained, therefore, for the reasons given, and for others appearing in this case, not necessary here to set out, to disallow this assignment of error.

On the cognate point raised by defendant, that it was error to permit the State in rebuttal to offer the testimony of witnesses as to the general reputation of the witness Compton, in the absence of defendant's *offering witnesses* to impeach said Compton, we likewise hold that since the defense had sought to impeach this witness in every other legal way except by offering witnesses as to his general reputation for honesty and truth and veracity, evidence by witnesses called by the State in rebuttal on the general reputation of Compton, was admissible. [State v. Weisman, 238 Mo. 547; State v. Christopher, 134 Mo. App. 6.] It may well be that the novel conditions presented by this record, in this, that the testimony in chief of said Compton for the State was colorless and valueless, and the fact that all of the objectionable and damaging testimony coming from him was elicited by defendant

on cross-examination, would of themselves excuse all of the alleged errors of which defendant complains in this behalf. We merely suggest this as plausible, without passing on it here.

We have deemed it our duty, since defendant is not represented in this court by counsel, to thus carefully go over the record, to find if there be error in it to defendant's prejudice. We have found none of sufficient moment to justify interference, and since in our view the conviction was right, think it ought to be affirmed, and we so order. *Brown, P. J.,* and *Walker, J.,* concur.